# In the United States Court of Appeals for the Ninth Circuit

THOMAS A. SHIELDS, ET AL.,
PLAINTIFFS-APPELLANTS

*v.*

WORLD AQUATICS,
DEFENDANT-APPELLEE

INTERNATIONAL SWIMMING LEAGUE, LTD,
PLAINTIFF-APPELLANT

*v.*

WORLD AQUATICS,
DEFENDANT-APPELLEE

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA (CIV. NOS. 18-7393; 18-7394)
(THE HONORABLE JACQUELINE SCOTT CORLEY, J.)*

**JOINT BRIEF OF APPELLANTS**

JEFFREY L. KESSLER
JOHANNA RAE HUDGENS
WINSTON & STRAWN LLP
  200 Park Avenue
  New York, NY 10166
  (212) 294-6700
  jkessler@winston.com
  jhudgens@winston.com
Counsel for Thomas A. Shields, et al.

WILLIAM A. ISAACSON
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  2001 K Street, N.W.
  Washington, DC 20006
  (202) 223-7300
  wisaacson@paulweiss.com
Counsel for International Swimming
League, Ltd.

*(additional counsel on inside cover)*

JEANIFER E. PARSIGIAN
WINSTON & STRAWN LLP
  101 California Street
  San Francisco, CA 94111
  (415) 591-1000
  jparsigian@winston.com
Counsel for Thomas A. Shields, et al.

MEREDITH DEARBORN
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  535 Mission Street, 24th Floor
  San Francisco, CA 94105
  (650) 208-2788
  mdearborn@paulweiss.com
Counsel for International Swimming
League, Ltd.

ANDREW E. TAUBER
WINSTON & STRAWN LLP
  1901 K Street NW
  Washington, DC 20006
  (202) 282-5000
  atauber@winston.com
Counsel for Thomas A. Shields, et al.

BRETTE TANNENBAUM
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  1285 Avenue of the Americas
  NEW YORK, NY 10019
  (212) 373-3852
  btannenbaum@paulweiss.com
Counsel for International Swimming
League, Ltd.

## CORPORATE DISCLOSURE STATEMENT

Appellant International Swimming League, Ltd. is 90% owned by International Swimming League (CY) Holding Ltd. No publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................. iii

INTRODUCTION ........................................................................... 1

STATEMENT OF JURISDICTION .......................................................... 3

STATEMENT OF THE ISSUES ............................................................. 4

STATEMENT OF THE CASE .............................................................. 4

I.    Background .......................................................................... 4

      A.    The structure of FINA and top-tier swimming ...................... 4

      B.    ISL seeks to enter the market to promote top-tier
            swimming competitions. ............................................... 6

      C.    FINA organizes a group boycott to block ISL's market
            entry .................................................................... 8

      D.    Plaintiffs file two antirust actions and, in response,
            FINA amends GR 4. ................................................... 12

II.   Proceedings Below ................................................................ 14

      A.    The court denies the parties' requests to extend
            deadlines for expert reports ......................................... 14

      B.    The court grants summary judgment to FINA. ..................... 16

STANDARD OF REVIEW ................................................................. 19

SUMMARY OF ARGUMENT .............................................................. 19

ARGUMENT ............................................................................... 22

I.    The court applied the wrong standard to FINA's horizontal
      group boycott. ..................................................................... 22

A.   The court erroneously held that FINA's rules did not constitute a group boycott......................................................29

1.   A group boycott does not require a complete exclusion of competition. ...............................................29

2.   Plaintiffs presented sufficient evidence that FINA engaged in a group boycott even under the more stringent test erroneously applied. ...............................32

B.   The per se and quick-look standards apply to group boycotts in the sports industry. ...............................................36

II.   The court erred in concluding that, under rule of reason analysis, plaintiffs' Section 1 claims could not rest on evidence of direct anticompetitive effects. ....................................41

III.  The court erred in holding that expert testimony was required to establish the relevant market. ....................................48

IV.   The court abused its discretion by precluding plaintiffs from presenting a merits expert on market definition...........................53

CONCLUSION ..........................................................................56

STATEMENT OF RELATED CASES ......................................................59

FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS................60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.,*
141 F.3d 947 (9th Cir. 1998)................................................26, 27, 37

*Amarel* v. *Connell,*
102 F.3d 1494 (9th Cir. 1996).............................................54

*Bacchus Indus., Inc. v. Arvin Indus., Inc.,*
939 F.2d 887 (10th Cir. 1991)............................................49

*Bhan v. NME Hosps., Inc.,*
929 F.2d 1404 (9th Cir. 1991)............................................41, 42, 47

*Blalock v. Ladies Pro. Golf Ass'n,*
359 F. Supp. 1260 (N.D. Ga. 1973)........................................37

*Cal. Dental Ass'n v. F.T.C.,*
526 U.S. 756 (1999) ....................................................24

*Copperweld Corp. v. Independence Tube Corp.,*
467 U.S. 752 (1984) ....................................................24

*Denver Rockets v. All-Pro Mgmt., Inc.,*
325 F. Supp. 1049 (C.D. Cal. 1971), *aff'd,*
*Haywood v. Nat'l Basketball Ass'n*, 401 U.S. 1204 (1971) ................37

*Epic Games v. Apple, Inc.,*
67 F.4th 946 (9th Cir. 2023)..............................................23, 24, 41, 47

*F.T.C. v. Actavis, Inc.,*
570 U.S. 136 (2013) ....................................................22

*F.T.C. v. Ind. Fed'n of Dentists,*
476 U.S. 447 (1986) ....................................................41, 42, 45, 46, 47

*Fashion Originators' Guild of Am., Inc. v. F.T.C,*
312 U.S. 457 (1941) ....................................................37

iii

*Fed. Trade Comm'n v. Penn State Hershey Med. Ctr.*,
    838 F.3d 327 (3d Cir. 2016) ................................................................. 52

*In re Flat Glass Antitrust Litig.*,
    385 F.3d 350 (3d Cir. 2004) ................................................................. 43

*Fox v. Good Samaritan Hosp.*,
    2007 WL 2938175 (N.D. Cal. Oct. 9, 2007) ...................................... 51

*Gen. Indus. Corp. v. Hartz Mountain Corp.*,
    810 F.2d 795 (8th Cir. 1987) ............................................. 49, 50, 52

*Goodman v. Staples the Office Superstore, Ltd. Liab. Co.*,
    644 F.3d 817 (9th Cir. 2011) ............................................................... 19

*California ex rel. Harris v. Safeway, Inc.*,
    651 F.3d 1118 (9th Cir. 2011) ...................................................... 24, 27

*Int'l Boxing Club v. United States*,
    358 US 242 (1959) .................................................................................. 51

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*,
    359 U.S. 207 (1959) ......................................................................... 30, 37

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*,
    726 F.2d 1381 (9th Cir. 1984) ........................................................... 51

*Law v. Nat'l Collegiate Athletic Ass'n*,
    134 F.3d 1010 (10th Cir. 1998) ......................................................... 39

*McNeil v. Nat'l Football League*,
    790 F. Supp. 871 (D. Minn. 1992) .................................................... 51

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) ................................................ 23, 25, 37

*Nat'l Collegiate Athletic Ass'n v. Alston*,
    141 S. Ct. 2141 (2021) ................................................................... 39, 50

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*,
    468 U.S. 85 (1984) ...................................... 28, 29, 38, 39, 51

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
933 F.3d 1136 (9th Cir. 2019) ................................................ 44

*Nat'l Soc'y of Pro. Eng'rs v. United States*,
435 U.S. 679 (1978) ..................................................... 23, 37

*Nw. Wholesale Stationers, Inc. v. Pacific Stationery &*
*Printing Co.*,
472 U.S. 284 (1985) ..................................................... 30, 31

*O.E.M. Glass Network, Inc. v. Mygrant Glass Co., Inc.*,
2023 WL 2563689 (E.D.N.Y. 2023) ............................................ 30

*Ohio v. Am. Express Co.*,
138 S. Ct. 2274 (2018) ................................................... 23, 41

*Oltz v. St. Peter's Cmty. Hosp.*,
861 F.2d 1440 (9th Cir. 1988) .............................................. 47

*Orchard Supply Hardware LLC v. Home Depot USA, Inc.*,
967 F. Supp. 2d 1347 (N.D. Cal. 2013) ...................................... 37

*Phila. World Hockey Club, Inc. v. Phila. Hockey Club, Inc.*,
351 F. Supp. 462 (E.D. Pa. 1972) .......................................... 51

*PLS.com v. Nat'l Ass'n of Realtors*, 32 F.4th 824 (9th Cir.
2022) *cert. denied*, 143 S. Ct. 567 (2023).. 23, 25, 26, 28, 29, 30, 36, 37,
41, 47

*R & R Sails, Inc. v. Ins. Co. of Pa.*,
673 F.3d 1240 (9th Cir. 2012) ............................................. 55

*Rebel Oil Co. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) .............................................. 47

*Robertson v. Nat'l Basketball Ass'n*,
389 F. Supp. 867 (S.D.N.Y. 1975) ....................................... 37, 51

*S&S Commc'ns v. Local Exch. Carriers Ass'n, Inc.*,
2006 WL 519651 (D. S.D. Mar. 1, 2006) ................................... 52, 56

*Sidibe v. Sutter Health*,
  2019 WL 2078788 (N.D. Cal. Apr. 12, 2019) ....................................... 52

*Smith v. Pro Football*,
  593 F.2d 1173 (D.C. Cir. 1978) ............................................................. 37

*Trunk v. City of San Diego*,
  629 F.3d 1099 (9th Cir. 2011) .............................................................. 19

*U.S. Football League v. Nat'l Football League*,
  644 F. Supp. 1040 (S.D.N.Y. 1986), *aff'd*, 842 F.2d 1335
  (2d Cir. 1988) ........................................................................................ 51

*United States v. Pabst Brewing Co.*,
  384 U.S. 546 (1966) ....................................................................... 49, 52

*Wash. State Bowling Proprietors Ass'n v. Pac. Lanes, Inc.*,
  356 F.2d 371 (9th Cir. 1966) ............................................................... 37

**Statutes**

28 U.S.C. § 1291 ......................................................................................... 3

28 U.S.C. § 1331 ......................................................................................... 3

28 U.S.C. § 1337 ......................................................................................... 3

Sherman Act ......................................................................................... 3, 25

Sherman Act § 1 ............................................. 13, 16, 19, 20, 21, 22, 40

Sherman Act § 2 ...................................................................................... 13

**Other Authorities**

7 P. Areeda, Antitrust Law ¶ 1511 (1986) ............................................. 42

Dep't of Justice & F.T.C., *Horizontal Merger Guidelines*,
  4.1.2 (August 19, 2010) ........................................................................ 43

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*
  1911a (4th Ed. 2022) ............................................................................ 24

# INTRODUCTION

Appellant International Swimming League (ISL) is a new, innovative competitor in the market for top-tier swimming events. With its fast-paced competition, high entertainment value, bigger-than-usual prizes for winners, and mixed male-female teams, ISL gained the attention of top-flight, Olympic-tested swimmers and the support of national swimming federations. In 2017, with the endorsement of USA Swimming, British Swimming, and the Italian Swimming Federation, ISL began planning competitive events for 2018 in Las Vegas, Indianapolis, and London, and scheduled an event in Torino, in which many of the world's leading swimmers agreed to participate.

Appellants also include a class of swimmer plaintiffs who contracted to participate in ISL swimming events. ISL presented the first opportunity for these swimmers to have a meaningful competitive alternative in the labor market for top-tier swimmers, which had been monopsonized by Fédération Internationale de Natation (FINA), the private organization that seeks to control the sport of swimming.[1]

---

[1] FINA changed its name in 2022 to World Aquatics. Appellants will refer to it as FINA, its name throughout the relevant period.

ISL's entry, and the competitive opportunities it would provide, was blocked by FINA. FINA has the power to block competition from ISL, or any other potential competitor, through its control over eligibility to participate in the Olympics, the most important competition for top-tier swimmers. Each national swimming federation must belong to FINA and agree to follow its rules for its athletes to be eligible for Olympics qualification. And all swimmers who seek to participate in the Olympics must maintain their national federation membership and follow FINA rules. FINA was thus able to thwart ISL's competition through a rule that required all the national federations to boycott "unauthorized" ISL events and to suspend any swimmers who participated in such events.

This group boycott, required by FINA General Rule 4 (GR 4), blocked ISL from entering the market in 2018. It also caused lasting damage to ISL's ability to compete in 2019 and thereafter, even though FINA relaxed its boycott, by amending GR 4, in response to this litigation.

Despite finding ample evidence that FINA and its member federations conspired through GR 4 to boycott ISL and block it from hosting top-tier competitions by depriving it of access to swimmers, the

court granted summary judgment to FINA. That decision was deeply flawed. The court misunderstood and misapplied binding precedent to carve out a "sports" exception to the per se and quick-look rules governing horizontal group boycotts; deviated from decades of precedent concerning the ability of antirust plaintiffs to prove anticompetitive effects through direct evidence; and failed to credit evidence concerning market definition from the market participants themselves after improperly denying appellants the opportunity to present an expert report on the subject.

That erroneous decision threatens to undermine application of the Sherman Act in the sports industry. It should be reversed.

## STATEMENT OF JURISDICTION

On January 6, 2023, the district court entered final judgments in favor of FINA and against the swimmer plaintiffs and ISL. The swimmer plaintiffs and ISL filed notices of appeal on January 19, 2023 and February 3, 2023, respectively. This Court has jurisdiction under 28 U.S.C. § 1291. The district court had jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1337.

## STATEMENT OF THE ISSUES

1.     Whether the court erred in applying the rule of reason rather than the per se or quick-look rules to plaintiffs' claims of a horizontal group boycott.

2.     Whether, even if full rule of reason applies, the court erred in concluding that, despite evidence of direct anticompetitive effects, plaintiffs' claims could not succeed without proof of the relevant market.

3.     Whether the court erred in holding that expert testimony was required to establish the relevant labor market, despite the availability of testimony from market participants establishing its parameters.

4.     Whether the court abused its discretion in denying plaintiffs' motion to extend a deadline and produce an expert report on market definition in circumstances where, under the court's interpretation of the law, that denial was dispositive of plaintiffs' claims and where the requested extension would have caused no prejudice to the defendant.

## STATEMENT OF THE CASE

## I.     Background

### A.     The structure of FINA and top-tier swimming.

Defendant-appellee FINA is the self-proclaimed private governing body for aquatic sports.  3-ER-426–27.  Organized under Swiss law, FINA

is composed of more than 200 national swimming federation members, each of which serves as the national body for swimming in its respective jurisdiction.  Pursuant to FINA's constitution, all national federations must comply with FINA's rules, ensure their swimmers comply with those rules, and enforce penalties levied by FINA against swimmers and other federations.  4-ER-792–93, 795; 4-ER-830.

FINA's power is derived from its position as the gatekeeper to swimmers' participation in the Olympics.  To qualify for the Olympics, swimmers must be members in good standing of a national federation, follow all FINA rules, and meet criteria set by FINA.  4-ER-861; 4-ER-837.  Because Olympics participation is the goal of all top-tier swimmers, both the swimmer plaintiffs and their national federations had no choice but to agree to follow FINA rules.  2-ER-96.

In addition to controlling Olympic eligibility, FINA promotes its own top-tier swimming events and sanctions competitions organized by other entities.  4-ER-792; 3-ER-426; 2-ER-100.  These commercial events compete in the labor market for top-tier swimmers, as well as in the output market for sponsors and fans.  4-ER-779, 781.

National federations must obtain approval from FINA before hosting any international competition. 4-ER-924. This requirement results in a "one-global-body-to-rule-them-all model," 5-ER-995, that FINA claims provides it with the "right and the power to ban 'unauthorized' competitions." 5-ER-1005. Because of this "power," FINA has been able to monopsonize the labor market for top-tier swimmers. 2-ER-96; 2-ER-218.

Specifically, FINA's GR 4 prohibited national federations from having "any kind of relationship" with any competitor unless FINA approved it. 4-ER-830. Prior to July 2019, GR 4 also required that any "individual or group," including swimmers, that violated the prohibition on unauthorized relations be "suspended by the affiliated [national federation] for a minimum period of one year, up to a maximum period of two years." 3-ER-440. FINA board minutes confirmed that "athletes participating in competitions or having relations with bodies not recognized by FINA are exposed to sanctions, namely the non-participation at the Olympic Games or World Championships." 3-ER-465–66.

## B. ISL seeks to enter the market to promote top-tier swimming competitions.

Incorporated in Switzerland and based in Ukraine, plaintiff-appellant ISL promotes international swimming competitions. 3-ER-499. Plaintiff-appellants Thomas A. Shields, Michael C. Andrew, and Katinka Hosszú (together with the injunctive class, the "swimmer plaintiffs") are professional swimmers who sought to participate in competitions organized by ISL. They represent an injunctive class, certified by the court below, comprised of professional swimmers who contracted to participate in ISL swimming events. 1-ER-28.[2]

In 2017, ISL approached FINA to request that it sanction ISL's competitions, believing that "without FINA approval, it is not possible to organize an event in swimming." 3-ER-511. However, FINA recognized that ISL would be a "competitor" to the events promoted by FINA and thus concluded that "ISL is an organisation that wants to weaken" FINA. 3-ER-633–39; 3-ER-642. FINA demanded that ISL, among other things, pay millions of dollars, transfer ownership of its events, and cede control of commercial sponsorships in exchange for FINA's sanction. 3-ER-529; 3-ER-535; 3-ER-553–66; 4-ER-954–64. Unwilling to accede to those

---

[2] The plaintiff swimmers also sought certification of a damages class and are appealing the district court's denial of that request. 6-ER-1353.

demands, ISL was unable to reach an agreement with FINA. It therefore tried to enter the market for top-tier swimming events without FINA's approval. 3-ER-511–13.

In 2018, ISL began negotiating with several national swimming federations, including USA Swimming, British Swimming, Swimming Australia, and the European Swimming League (LEN), to promote international competitions in partnership with ISL. 3-ER-574; 3-ER-611–17; 3-ER-579; 3-ER-601–05. USA Swimming, British Swimming, and the Italian Swimming Federation all expressed interest in partnering with ISL because of the increased competitive opportunities ISL would provide for their swimmers. 3-ER-574; 3-ER-611–17; 3-ER-579; 3-ER-601–05; 3-ER-584; 3-ER-588; 3-ER-592–93; 3-ER-603. The discussions progressed and the parties began discussing the details—including budgets, marketing, and broadcasting rights—for events in London, Las Vegas, and Torino in 2018. *Id.* ISL later contracted with various swimmers, including the swimmer plaintiffs, to participate in Torino in 2018. 5-ER-1052–55.

## C. FINA organizes a group boycott to block ISL's market entry.

FINA executives discussed the threat posed by ISL's entry into the market, worrying that ISL could "competitively injure FINA." 3-ER-521. On June 5, 2018, FINA sent a memorandum to all national federations stating that it was "aware of a so-called international competition 'International Swimming League.'" 3-ER-645. The memorandum told national federations that FINA "has neither sanctioned the competitions organised by this entity, nor approved their sanction by other [FINA] bodies." *Id*. at 646. Invoking GR 4's prohibition on relationships with non-affiliated bodies, the memorandum warned that FINA would apply GR 4 "as and where appropriate." *Id.* That same day, FINA Vice President Dale Neuburger followed up with USA Swimming, warning that the "potential ramifications" of participating in ISL events "are severe . . . not just for swimmers, and not just for USA Swimming," but for all U.S. aquatic sports. 3-ER-653.

Immediately, national federations that had been planning events with ISL recognized that they had no choice but to join the boycott. Within hours of the FINA memorandum, USA Swimming COO Mike Unger wrote to other USA Swimming officials that "FINA flexing its muscles" was "NOT a good sign for [ISL's] existence." 5-ER-973. One

week later, on June 13, USA Swimming informed ISL that "a small group" of its leadership had met "to discuss the opportunity related to USA Swimming's participation with the ISL and the competition in London." 3-ER-650. "Ultimately," USA Swimming explained, it had reached "the conclusion that before USA Swimming can commit to taking part, we need to get an assurance from ISL and from FINA (in writing) that FINA is on board with the concept of the ISL and approves of the concept." *Id.* USA Swimming added that it did "not want to put our athletes (or USA Swimming) at risk." *Id.*

On July 10, the CEO of British Swimming likewise wrote to ISL: "You're aware of the risks to British Swimming around this project linked to FINA. We are strong supporters of ISL but we cannot afford to take risks with our core purpose of delivering medals at the Olympic Games." 3-ER-657. The London event was cancelled, 3-ER-660, and an event planned for Las Vegas in coordination with USA Swimming was "scratch[ed] . . . from the calendar." 3-ER-569.

Initially, the Italian national federation and the European Sports Federation continued working with ISL on the event planned for Torino, Italy. 3-ER-465–66. FINA internally discussed its response, with Vice

President Neuburger urging a suspension and fine against the Italian federation and its president, Paolo Barelli. Neuburger described FINA's anticompetitive goal as follows:

> [W]e punish Italian Federation and [European federation president Paolo] Barelli. Suspension and fine. Maybe more. Hurt them badly for doing this. When we do this, what other Federation would want to host an ISL event? They know they will be severely punished. . . . No Federation will be stupid enough to host an event in the future.

4-ER-771.

Confident that "no Federation will want to conduct an I[S]L event because they know we will kill them too" (*id.* at 770), on October 30, 2018, FINA issued another memorandum to all national federations, stating that the "competition to be held in Torino (Italy) on 20th–21st December 2018 is not recognized" and that FINA "will consider consequences in application of art. GR 4 and BL 12." 3-ER-669. As Neuburger stated in emails immediately preceding the memorandum, the "hammer is about to come down on the Torino event." 5-ER-975.

Within weeks, national federations were forced to join the boycott of the Torino event, warning their member athletes not to attend. The Swiss Federation, for example, told its athletes that in light of

> this FINA Memorandum and under the current circumstances, in case of a participation in this event, the Swiss Swimming Federation, as a FINA member organization, would be forced by FINA, to ban you for at least 1 year from all competition measures (FINA GR 4). FINA would even be able to extend this ban up to 2 years. Therefore I explicitly propose you to not participate.

4-ER-679. Other national federations, including British Swimming and the Russian Swimming Federation, followed suit. 3-ER-671, 4-ER-681. The Italian Federation, which was going to host the Torino event with ISL, concluded that Torino had to be cancelled, as "it simply cannot take the risk of Athletes . . . receiving sanctions." 4-ER-683.

Nor was ISL the only market entrant thwarted by FINA's group boycott. Threats by FINA to enforce GR 4 resulted in cancellation of a 2018 event in Singapore planned by the World Swimming Association (WSA). 3-ER-491; 3-ER-495; 4-ER-937. FINA issued similar threats—invoking GR 4 and warning members and athletes against participation in events organized by the World High Diving Federation and World Open Water Swimming Association, as well as a planned "OceanMan" competition. 3-ER-607, 609, 632.

**D. Plaintiffs file two antitrust actions and, in response, FINA amends GR 4.**

On December 7, 2018, ISL and the swimmer plaintiffs brought separate actions against FINA asserting claims under Sections 1 and 2 of the Sherman Act. In response, in 2019, FINA amended GR 4 to eliminate the portion of the rule providing for the suspension of swimmers who compete in unsanctioned events.

As a result of this post-litigation amendment, ISL, although badly injured by its delayed entry caused by the FINA boycott, was able to stage seven competitions in 2019 (compared to the 17 competitions originally planned). 4-ER-708, 4-ER-726–27; 4-ER-753; 4-ER-756; 5-ER-983. Even this limited injection of competition had immediate, positive effects in the labor market for swimmers. ISL's entry expanded output and increased swimmers' compensation, both directly through the prize money and appearance fees it paid, and indirectly by forcing FINA to respond by increasing compensation that it paid swimmers. 2-ER-226. Furthermore, to compete on a team basis with ISL, FINA created a new "Champions" series of events, directly modeled on ISL's team-competition format, in which it paid an additional $2.7 million to swimmers. 4-ER-760; 5-ER-991; 4-ER-765. As FINA explained in an internal

memorandum: "Behind the closed door, FINA purpose is: 1. Not to lose dominant position in the market place. . . ." 3-ER-636.

FINA was nonetheless prepared to continue its boycott insofar as it believed it could do so safely while litigation was pending. For example, in an October 2019 email, FINA informed USA Swimming that USA Swimming was being "formally put on notice" that if an ISL event proceeded with USA Swimming's approval, that would "trigger clear situation of violation" of FINA BL 12. 4-ER-786. Even after GR 4 was amended in response to this litigation to remove the threat of suspension against individual swimmers, FINA BL 12 continued to provide that "[a]ll Continental and Regional Organisations and Member Federations shall seek approval from FINA for any International Competition to be organised or sanctioned by them." 4-ER-924–25. Failures to comply with BL 12 were subject to sanctions. *Id.* at 925.

## II. Proceedings Below

### A. The court denies the parties' requests to extend deadlines for expert reports.

On August 31, 2021, the court adopted the parties' stipulated case management schedule, which set September 27, 2021, as the deadline for plaintiffs to produce reports of their merits experts, and November 1,

2021, as the deadline for FINA to produce reports of its merits experts. 2-ER-130. The same schedule set a deadline of December 20, 2021, or "60 days after the Court's Order on class certification, whichever is later," for motions for summary judgment. *Id.* The Court did not issue its order on class certification until February 11, 2022. 1-ER-51-80.

On February 8, 2022, the parties notified the court of a dispute concerning the deadlines for producing merits expert reports. 2-ER-116–27. Although the deadlines for the parties' respective disclosures had passed while class-certification motions were pending and class-expert briefing was conducted, both parties requested leave to file their experts' merits reports at a later date. Plaintiffs proposed extending both parties' deadlines; FINA urged the court to extend only its deadline. Under either proposal, summary judgment motions would have been due on May 27, 2022. *Id.* A trial date had yet to be set.

On March 3, 2022, the court held a hearing at which the parties' respective requests were discussed. The court noted it "probably would have signed the stip if the parties had agreed to allow both sides" to file merits expert reports. 1-ER-44. But, in light of the parties' disagreement regarding the extension of plaintiffs' deadline, the court declined to

extend either deadline. *Id.* The court stated that "[u]nder Rule 16, there has to be good cause and certainly no good cause has been shown for missing those deadlines." *Id.* at 39. The court noted that, in the absence of expert testimony: "It will be an interesting case. You'll be challenged, all of you, in explaining it well to the jury." *Id.* at 44–45.

On June 27, 2022, the parties filed their respective motions for summary judgment. ECF Nos. 321–30.

## B. The court grants summary judgment to FINA.

On January 6, 2023, the court granted FINA's summary judgment motion, denied plaintiffs' motion, and entered judgment in favor of FINA. 1-ER-3–32.

With respect to plaintiffs' claims under Section 1 of the Sherman Act, the court first held that a "reasonable trier of fact could find FINA and its member federations are not a single economic unit and are actual or potential competitors." *Id.* at 10. The court noted that both FINA and its member federations "host their own competitions from which they independently financially benefit"; that the "member federations negotiated directly with ISL, without prior approval" from FINA; and that although FINA may be in a "vertical" relationship with its members

"as a matter of governance," they are nonetheless "at the same level of distribution with respect to putting on swimming competitions." *Id.* at 10–12.

The court further held that a "reasonable trier of fact could also find FINA's written rules constitute concerted action by FINA and its member federations." *Id.* at 12. And the court concluded that a "reasonable trier of fact could find FINA's rules constituted a horizontal restraint of trade" because the evidence in the record "supports a finding that FINA's member federations, who are at the same level of distribution for putting on international competitions and buying swimmers' services, agreed not to do business with ISL without FINA's approval." *Id.* at 14. The court then held that the federations "understood that [FINA GR 4] could be used to suspend swimmers for participating in the Torino event, and some advised their swimmers of that risk." *Id.* at 6–7.

Despite these findings, the court granted FINA summary judgment. It did so based on a series of legal errors.

First, the court erroneously found that the horizontal group boycott against ISL implemented through FINA's rules was not subject to either per se or quick-look condemnation because it erroneously believed that:

(1) FINA's rules did not deny ISL access to swimmers; and (2) a per se or quick-look analysis cannot be applied to a group boycott in the sports business. *Id*. at 6–7, 16, 18.

Second, the court wrongly concluded that plaintiffs were required to prove a relevant market to establish the anticompetitive effects of FINA's rules and could not do so through direct evidence of such effects, such as reduced output and compensation. *Id*. at 19–21.

Third, the court erroneously held that the relevant market had to be proven through expert testimony and could not be established through the testimony of market participants. 2-ER-94–95; 2-ER-85–86.

Finally, the court abused its discretion when it refused to extend the deadline for plaintiffs to submit a merits expert report establishing the relevant market—a ruling that proved fatal to plaintiffs' case, given the court's subsequent ruling that expert testimony defining the relevant market is necessary to establish anticompetitive effects. The court denied that extension despite the lack of prejudice to FINA and the fact

that the trial schedule would not have been affected by the short extension plaintiffs requested.[3]

Plaintiffs timely appealed.  6-ER-1352–55.

## STANDARD OF REVIEW

A court's ruling on motions for summary judgment are reviewed de novo.  *Trunk v. City of San Diego*, 629 F.3d 1099, 1105 (9th Cir. 2011).  A court's ruling precluding an expert from submitting a merits report is reviewed for an abuse of discretion.  *Goodman v. Staples the Office Superstore, Ltd. Liab. Co.*, 644 F.3d 817, 822 (9th Cir. 2011).

## SUMMARY OF ARGUMENT

The court committed multiple legal errors in granting FINA's motion for summary judgment on plaintiffs' Section 1 claims.[4]

1.    The court legally erred when it refused to apply a per se or quick-look analysis to FINA's conduct.  The court incorrectly held that the challenged FINA rule was not a classic group boycott because the court erroneously believed that FINA's

---

[3]    The district court also granted summary judgment against plaintiffs' other claims, but plaintiffs are appealing only the dismissal of their Section 1 claims.

[4]    Plaintiffs are not appealing the denial of their cross-motion for summary judgment.

GR 4 did not prevent swimmers from participating in unsanctioned events when the evidence showed that the rule had precisely that effect. The court then compounded that error by applying the wrong legal standard, mistakenly holding that a horizontal boycott is not subject to per se or quick-look analysis unless it completely precludes the plaintiff from competing in the market. At the very least, plaintiffs presented sufficient evidence to create a dispute of material fact as to whether GR 4 constituted a horizontal group boycott subject to summary condemnation under the proper legal standard.

2.    The court also erred when it concluded that GR 4 was subject to neither per se nor quick-look analysis, even if it were a horizontal group boycott, because FINA imposed the rule in the sports business. Both the Supreme Court and this Circuit have made clear that the sports business is not immune from the application of per se or quick-look analysis. In fact, the Supreme Court first applied the quick-look approach to hold a sports association's rules to be a Section 1 violation.

Because the challenged FINA conduct is precisely the type of horizontal group boycott with which courts have significant experience, it is properly subject to either per se or quick-look condemnation.

3.  Even if GR 4 were not subject to per se or quick-look analysis, the court erred in its rule of reason analysis by mistakenly concluding that plaintiffs had to prove the existence of a relevant market and market power to establish a Section 1 violation.  Both Supreme Court and Ninth Circuit precedent make clear that such proof is not needed when, as here, there is evidence of direct anticompetitive effects caused by a horizontal agreement.

4.  Even if plaintiffs were required to prove the existence of a relevant market, the court erred when it concluded that they could not do so absent expert testimony.  A relevant market may also be proved by lay testimony from participants in the market.  Plaintiffs presented such evidence here, but the court ignored it.  At a minimum, such testimony raised fact issues

regarding market definition that are properly resolved by a jury.

5.  Finally, and especially given the ruling's dispositive effect, the court abused its discretion when it denied plaintiffs' request to extend the deadline to present expert testimony on relevant market and the anticompetitive effects of FINA's rules. The short extension plaintiffs requested posed no risk of unfair prejudice to FINA and would not have delayed the proceedings when, at the time of the court's ruling, summary-judgment motions were not due for many months, and a trial date had yet to be set.

## ARGUMENT

### I.  The court applied the wrong standard to FINA's horizontal group boycott.

When evaluating whether an agreement is an unreasonable restraint of trade under Section 1 of the Sherman Act, courts employ one of three standards of review on "a sliding scale" of scrutiny. *F.T.C. v. Actavis, Inc.*, 570 U.S. 136, 159 (2013) (citation omitted). The appropriate standard depends on the likelihood that the agreement at issue unreasonably restrains trade.

At one end of the spectrum "are agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality—they are 'illegal per se.'" *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 692 (1978). A group boycott by horizontal competitors is a "classic" example of an agreement that is per se illegal. This is because such agreements "always or almost always tend to restrict competition and decrease output." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1191 (9th Cir. 2015) (citation omitted); *PLS.com v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 833 (9th Cir. 2022) *cert. denied*, 143 S. Ct. 567 (2023). Per se rules of illegality are applied to group boycotts "without inquiring into market power." *Epic Games v. Apple, Inc.*, 67 F.4th 946, 974 n.6 (9th Cir. 2023).

At the other end of the spectrum are agreements "whose competitive effect can only be evaluated by analyzing the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed." *Nat'l Soc'y of Pro. Eng'rs*, 435 U.S. at 692. Such agreements are reviewed under the "rule of the reason," which "requires courts to conduct a fact-specific assessment of 'market power and market structure . . . to assess the [restraint]'s actual effect' on competition." *Ohio v. Am.*

*Express Co.*, 138 S. Ct. 2274, 2284 (2018) (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984)).

Between those two poles, "different applications of the rule of reason require different types and levels of inquiry." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* 1911a (4th Ed. 2022); *Epic Games*, 67 F.4th at 974 n.6 (citing Areeda & Hovenkamp). Horizontal agreements that are "not unambiguously in the per se category" may nonetheless "require no more than cursory examination to establish that their principal or only effect is anticompetitive." *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1134 (9th Cir. 2011) (quoting Areeda & Hovenkamp ¶ 1911a). Such agreements receive only "quick look" review, "without first defining the exact contours of the relevant market." *Epic Games*, 67 F.4th at 974 n.6. Quick-look is "appropriately used where 'an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets.'" *Safeway, Inc.*, 651 F.3d at 1134 (quoting *Cal. Dental Ass'n v. F.T.C.*, 526 U.S. 756, 770 (1999)).

The court should have condemned FINA's rules as an antitrust violation on a per se or quick-look basis. This Court has repeatedly explained that horizonal group boycotts are almost always subject to per se condemnation. *PLS.Com*, 32 F.4th at 833; *In re Musical Instruments*, 798 F.3d at 1191. And the court acknowledged that the evidence here established precisely such a horizontal group boycott. As the court explained, the evidence "supports a finding that FINA's member federations, who are at the same level of distribution for putting on international competitions and buying swimmers' services, agreed not to do business with ISL without FINA's approval." 1-ER-14. And the court likewise acknowledged that those same member federations understood that GR 4, which they were bound to uphold, threatened suspensions against swimmers who failed to comply with FINA's boycott. *Id.* at 4–5. Those agreements to "refuse to deal" are "anticompetitive horizontal agreements [that] violate the Sherman Act per se." *In re Musical Instruments*, 798 F.3d at 1191.

Moreover, the group boycott here possesses each of the three characteristics that this Court has identified as strongly indicative of boycotts meriting per se condemnation: "(1) the boycott cuts off access to

a supply, facility, or market necessary to enable the victim firm to compete; (2) the boycotting firm possesses a dominant market position; and (3) the practices are not justified by plausible arguments that they enhanced overall efficiency or competition." *Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 950 (9th Cir. 1998) (citation omitted). While "a concerted refusal to deal need not necessarily possess all of these traits to merit per se treatment" (*PLS.Com*, 32 F.4th at 835 (citation omitted)), the evidence here established that—or, at the very least, created a dispute of material fact whether—the boycott here possesses these three traits.

*First*, the evidence established that FINA's and its members' horizontal boycott cut off ISL's access to a necessary input for ISL to compete: top-tier professional swimmers. 3-ER-481–89. Applying GR 4, FINA used its group boycott to prevent ISL from accessing top-tier professional swimmers for all of its planned events in 2018. 4-ER-678–79.

*Second*, the evidence established that FINA occupies a dominant competitive position with respect to professional swimming events. FINA controls access to the Olympics, operates as the "sole governing

body" for international swimming, and establishes rules applying to more than 200 national federations. Further, FINA acknowledged that its "rule barring any member federation and its athletes from competing in events hosted by non-members" creates a "one-global-body-to-rule-them-all model." 5-ER-994–95.

*Third*, the evidence shows that the purpose of its group boycott was to preserve FINA's competitive dominance by excluding all competition. 4-ER-766. Fearing that ISL could "competitively injure FINA," FINA used GR 4 to deprive ISL of swimmers' services, threatening swimmers and their national federations with "severe" repercussions—including exclusion from the Olympics—were they to participate in an ISL event. 3-ER-521; 3-ER-652–55; 3-ER-670–71;4-ER-678–79; 4-ER-680–81;4-ER-682–84; 5-ER-974–76. The boycott, therefore, cannot be justified by "plausible arguments that [it] enhanced overall efficiency or competition." *Adaptive Power Sols., LLC*, 141 F.3d at 950.

Even if the per se rule did not apply to FINA's group boycott (it does), the court still should have subjected the boycott to quick-look condemnation. Such condemnation is appropriate here because "an observer with even a rudimentary understanding of economics could

conclude that the arrangements in question would have an anticompetitive effect on customers and markets," *Safeway, Inc.*, 651 F.3d at 1134 (citations omitted), and because the evidence indicates that FINA's rules restrained competition "in terms of price or output." *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 109 & n.39 (1984). Specifically, FINA's GR 4 restricted output by reducing the number of top-tier competitions available to fans, advertisers and swimmers, and artificially suppressed swimmer pay. *See supra* pp. 13-14.

Despite finding sufficient evidence that FINA's rules constituted concerted action by horizontal competitors to boycott ISL, the court mistakenly believed that it was required to apply the full rule of reason when evaluating the legality of FINA's boycott for two reasons.

First, the court found that appellants did "not identify any evidence, expert or otherwise," sufficient to conclude that FINA's conduct "constitutes a classic group boycott" because, the court said, "no reasonable trier of fact could find GR 4 deprives 'would-be competitors of a trade relationship which they need in order to enter (or survive in) the

level wherein the group operates.'" 1-ER-17 (quoting *PLS.com*, 32 F.4th at 834).

Second, the court held that it could not analyze the FINA rules under a per se or quick-look approach, because "[c]ourts do not have any experience with the restraint at issue here—the rules of a governing body for international and Olympic sports," and because "the Supreme Court has recognized that in certain industries, such as sports leagues, 'horizontal restraints on competition are essential if the product is to be available at all' and thus the rule of reason analysis applies.'" 1-ER-18 (quoting *Bd. of Regents*, 468 U.S. at 101).

Neither reason withstands scrutiny.

## A. The court erroneously held that FINA's rules did not constitute a group boycott.

### 1. *A group boycott does not require a complete exclusion of competition.*

The court stated that "[t]ypically" when there is a group boycott subject to per se or quick-look condemnation, "the boycotting group combines to deprive would-be competitors of a trade relationship which they need in order to enter (or survive in) the level wherein the group operates." 1-ER-10 (quoting *PLS.com*, 32 F.4th at 834) (emphasis omitted). The court then went on to hold that such a group boycott could

not be found so long as the victim of the conduct was not absolutely precluded from competing. The court found no such group boycott here because, "while FINA's cooperation makes it easier for ISL to organize a swimming competition, it is not necessary." *Id* at 17.

The court applied the wrong standard. Contrary to the court's understanding, a concerted refusal to deal "constitutes a group boycott ***even if the competitors do not completely cut off*** the competitor's access to inputs it needs" to compete in the market. *PLS.com*, 32 F.4th at 835 (citing *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 209 (1959) (emphasis added). The Supreme Court in *Klor's* applied the per se rule to hold a group boycott unlawful even though the boycotting firms did not refuse to provide the competitor the needed products, but rather agreed only to supply them at "discriminatory prices and [on] highly unfavorable terms." *Klor's, Inc.*, 359 U.S. at 209. To determine whether conduct constitutes a per se unlawful group boycott, "the relevant question is whether the purported boycott limited supply to the extent that [the plaintiff's] competitiveness was diminished, not whether [the plaintiff] was absolutely deprived of supply." *O.E.M. Glass Network, Inc. v. Mygrant Glass Co., Inc.*, 2023 WL 2563689, at *9 (E.D.N.Y. 2023)

(citing *PLS.com* 32 F.4th at 835–36); *Nw. Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 295 n.6 (1985) ("[A] concerted refusal to deal . . . on substantially equal terms . . . might justify per se invalidation if it place[s] a competing firm at a severe competitive disadvantage.").

There was no factual dispute that FINA's rules deprived ISL of access to trade relationships that, in turn, diminished its ability to compete. 1-ER-16. As an initial matter, the court found that FINA's rules "prevented and continue[] to prevent *member federations* from affiliating with ISL and other non-sanctioned entities." *Id.* As ISL's Andrea Di Nino attested when describing the impact of denying ISL the support of national federations for its events:

> [I]f you don't have the support of the local federation, you have . . . extra costs . . . because you need to bring FINA referees from different countries, anti-doping from different countries. . . . You're spending more energy to convince the local politicians to support the event because the event is not recognized by the National Federation . . . . So it's a huge extra amount of energy, expense, and therefore that you need to put to make the event happen and happen in correct way.

5-ER-1023. This type of diminished competitive ability is all that is required to show that the rules constituted a group boycott subject to per se or quick-look condemnation.

### 2. Plaintiffs presented sufficient evidence that FINA engaged in a group boycott even under the more stringent test erroneously applied.

Even under the court's erroneously high standard, plaintiffs presented more than sufficient evidence to establish a group boycott that "depriv[ed]" ISL "of a trade relationship which [it] need[ed]" to "enter (or survive)" in the market to stage top-tier swimming events. 1-ER-16. Specifically, the evidence showed that FINA's rules prevented ISL from holding any events in 2018 because GR 4 deprived ISL of access to top-tier swimmers—an essential input for swimming events.

The court misapprehended and ignored the evidence, finding that "GR 4 does not (and did not in 2018) prevent swimmers from participating in unauthorized events." *Id.* In fact, the evidence showed that before GR 4 was amended in 2019 after initiation of this litigation, the rule *did* prevent swimmers from participating in unauthorized events, including all those that ISL attempted to organize in 2018. GR 4 required that any "individual" participating in an unsanctioned event be

"suspended by the [individual's national federation] for a minimum period of one year, up to a maximum period of two years." 3-ER-439. As a result, no swimmer could participate in ISL events without being barred from participation in the Olympics and World Championships. 4-ER-933; 3-ER-464–65; 3-ER-479.

Although FINA submitted a declaration that the term "individuals" used in GR 4 did not include swimmers, 2-ER-109, extensive, contemporaneous evidence demonstrated that this declaration was a lie. For example, minutes from a 2018 FINA Executive Committee meeting, convened during FINA's campaign to prevent ISL from hosting any swimming event in 2018, stated that "***athletes*** participating in competitions or having relations with bodies not recognized by FINA are exposed to sanctions, namely the non-participation at the Olympic Games or World Championships." 3-ER-465–66 (emphasis added). Other evidence showed that numerous national federations—including British Swimming, USA Swimming, and the Swiss swimming federation—understood that GR 4 "force[d]" national federations to penalize "athletes that participate" in non-sanctioned meets. 3-ER-671. Indeed, one of these federations advised its swimmers to "not participate

in the ISL event" given the fact that they would be subject to such penalties if they competed in an ISL event. 4-ER-679; 3-ER-465–66; 3-ER-671, 4-ER-681. As even the court acknowledged, member federations understood that GR 4.5 could be used to "suspend swimmers for participating" in such events. 1-ER-6–7.

The court nonetheless erroneously found that plaintiffs did not establish exclusion from the market because, according to the court, GR 4 threatened only swimmers who participated in unsanctioned events "*involving a FINA member federation*," but not those that participated in independent competitions. *Id.* at 21 (emphasis in original). In support, the court cited the fact that "top-tier swimmers" participated in a 2019 event that ISL staged without cooperation from member federations. *Id.* That analysis is inconsistent with the evidence.

As an initial matter, the evidence shows that the threat of suspension under GR 4 was not limited to swimmers who participated in competitions involving member federations. The plain text of GR 4 not only bars member federations from co-sponsoring unsanctioned competitions, but also prohibits the "exchange of competitors" between member federations and non-affiliated bodies. 3-ER-440; 5-ER-830.

Minutes from FINA's February 8, 2018 board meeting further confirm that FINA intended to apply GR 4 to suspend athletes who "competed in WSA events" without any indication that those unsanctioned events were co-sponsored by a member federation. 3-ER-496. National federations likewise understood that the 2018 version of GR 4 threatened to suspend swimmers participating in *any* unsanctioned professional swimming competition, whether or not it was co-sponsored by a member federation. 4-ER-969; 3-ER-580; 5-ER-973; 3-ER-660; 4-ER-679.

Given the evidence that GR 4 applied regardless of member federation participation, it is immaterial that ISL's 2018 events were all planned in coordination with national federations. *Cf.* 1-ER-11. Nor does the participation of "top-tier swimmers" in an unsanctioned 2019 ISL event without the involvement of a national federation demonstrate that such an event could have proceeded in 2018. All parties acknowledge that FINA amended GR 4 in 2019 to repeal the provision providing for the suspension of swimmers. 4-ER-697. Thus, the fact that swimmers could compete in 2019 without fear of suspension, whether or not the unsanctioned competition involved a national federation, says nothing

about the threat against swimmers in 2018 *before* that change in the boycott rules was adopted.

By blocking ISL's access to swimmers in 2018, FINA's rules deprived ISL "of a trade relationship which [it] need[ed] in order to" participate in the market. *PLS.com*, 32 F.4th at 834; pp. 38–40, *infra*. Thus, even if plaintiffs were required to show that ISL was completely excluded from the market in order to establish a group boycott, as the court erroneously held, they carried their burden of doing so in 2018. At the very least, they provided evidence from which a reasonable jury could have found that the per se or quick-look standard applied.

## B. The per se and quick-look standards apply to group boycotts in the sports industry.

After erroneously finding that plaintiffs had failed to present evidence sufficient to show a group boycott, the court compounded that error by holding that it could not apply the per se or quick-look approaches "[r]egardless of whether GR 4 qualifies as a horizontal group boycott." 1-ER-17.

The court believed it could not apply a per se rule or quick-look analysis to FINA's group boycott because "[c]ourts do not have any experience with the restraint at issue here—the rules of a governing body

for international and Olympic sports." *Id.* at 18. But that analysis, which turns on the identity and business of the anticompetitive actor, ignores courts' extensive experience with the anticompetitive conduct being challenged.

Courts have decades of experience evaluating horizontal group boycotts across a wide variety of industries and have consistently found that such agreements, when they deprive a competitor of resources needed to compete, are per se unlawful. *See, e.g.*, *In re Musical Instruments*, 798 F.3d at 1191; *PLS.Com*, 32 F. 4th at 833–34 (citing *Smith v. Pro Football*, 593 F.2d 1173, 1178 (D.C. Cir. 1978)); *Adaptive Power Sols., LLC*, 141 F.3d at 949; *Orchard Supply Hardware LLC v. Home Depot USA, Inc.*, 967 F. Supp. 2d 1347, 1354 (N.D. Cal. 2013); *Klor's, Inc.*, 359 U.S. at 212; *Nat'l Soc'y of Pro. Eng'rs*, 435 U.S. at 692; *Fashion Originators' Guild of Am., Inc. v. F.T.C.*, 312 U.S. 457 (1941). Given that wealth of experience with group boycotts generally, courts have held sports league or sports association rules illegal per se when horizontal group boycotts have been employed. *See, e.g.*, *Denver Rockets v. All-Pro Mgmt., Inc.*, 325 F. Supp. 1049, 1066 (C.D. Cal. 1971), *aff'd*, *Haywood v. Nat'l Basketball Ass'n*, 401 U.S. 1204, 1207 (1971); *Robertson*

*v. Nat'l Basketball Ass'n*, 389 F. Supp. 867, 890–91 (S.D.N.Y. 1975); *Wash. State Bowling Proprietors Ass'n v. Pac. Lanes, Inc.*, 356 F.2d 371, 376–77 (9th Cir. 1966); *Blalock v. Ladies Pro. Golf Ass'n*, 359 F. Supp. 1260, 1265–66 (N.D. Ga. 1973). That the classic group boycott at issue here arises in the sports context does not change the fact that it is the "kind of restraint" that allows a "court to predict with confidence that the rule of reason will condemn it." 1-ER-17.

In addition to wrongly believing that courts lack sufficient experience with boycotts like the FINA group boycott, the court erroneously concluded that "the rule of reason analysis applies" because "the Supreme Court has recognized that in certain industries, such as sports leagues, 'horizontal restraints on competition are essential if the product is to be available at all.'" *Id*. at 18 (quoting *Bd. of Regents*, 468 U.S. at 101). The court misunderstood the Supreme Court's statement. Although the Supreme Court has recognized that certain horizontal restraints are necessary for producing a sports product, it has never suggested (much less held) that the per se or quick-look approaches are inapplicable whenever a horizontal restraint occurs in the sports context.

That *some* sports business restraints on competition are "essential" if a sports-league product is to be available does not mean that a full rule of reason analysis applies to *all* restraints in the sports business, especially where, as here, the challenged restraint is not even arguably necessary to offer the product at issue.

The Supreme Court's decision in *Board of Regents* is instructive. That case involved a challenge to the rules of a sports association—the NCAA—which restricted horizontal competition by conferences and schools in the sale of broadcast rights to college football games. Recognizing that "the rule of reason can sometimes be applied in the twinkling of an eye," the Court held that "when," as in this case, "there is an agreement not to compete in terms of price or output, 'no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement.'" *Bd. of Regents*, 468 U.S. at 109 & n.39 (citations omitted). Because a "naked restraint on price and output" always "requires some competitive justification," the Supreme Court has "never required proof of market power in such a case." *Id.* In other words, when sports industry rules are not "essential" to the offering of a joint sports product, but rather constitute a horizontal restraint on

competition, there is no need to engage in full-blown rule of reason analysis. *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2155 (2021) (reviewing law applying per se or quick-look analysis to horizontal restraints, including in sports cases); *Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1010, 1020 (10th Cir. 1998) (applying quick-look analysis).

The rules embodying the group boycott challenged here were not adopted by a sports league—FINA is an association of independent national federations, not a league—and are not "essential" for conducting FINA's Olympic qualifying events. Not even FINA argued that they were. In fact, FINA had no difficulty staging its Olympics qualifying events after amending GR 4 in 2019 to eliminate the rule's prohibition on swimmers participating in unsanctioned events. 5-ER-997.

While FINA has rules that might be essential to its Olympics or World Championship qualifying events—such as rules governing doping, pool size, and salinity—GR 4 does not fall into that category. Instead, the evidence shows that its only purpose was to deprive competitors, like ISL, of access to the swimmers and national federations. 4-ER-674; 4-ER-770; 3-ER-518–20, 521; 2-ER-226.

**II.    The court erred in concluding that, under rule of reason analysis, plaintiffs' Section 1 claims could not rest on evidence of direct anticompetitive effects.**

The court also erred in holding that plaintiffs could not prevail on their Section 1 claims without proving a relevant market and market power. 1-ER-20. As this Court has explained, where a "plaintiff can make a showing of anti-competitive effects, a formal market analysis becomes unnecessary." *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1413 (9th Cir. 1991); *see also PLS.com*, 32 F.4th at 834 (if a plaintiff establishes "actual detrimental effects," then "no inquiry into market definition and market power is required" (cleaned up)). The Supreme Court has likewise held that even under the rule of reason there is no "need to precisely define the relevant market" when concluding that horizonal agreements are unlawful based on anticompetitive effects. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 n.7 (2018); *F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447, 459 (1986). And this Court reaffirmed that principle just months ago. *Epic Games, Inc.*, 67 F.4th at 974 n.6.

The rationale for this rule—that direct proof of anticompetitive effects renders proof of a relevant market unnecessary—is straightforward: "the purpose of the inquiries into market definition and

market power is to determine whether an arrangement has the potential for genuine adverse effects on competition." *Ind. Fed'n of Dentists*, 476 U.S. at 460. Accordingly, "'proof of actual detrimental effects, such as a reduction of output,' can obviate the need for an inquiry into market power, which is but a 'surrogate for detrimental effects.'" *Id.* at 460–461 (citing 7 P. Areeda, Antitrust Law ¶ 1511, p. 429 (1986)). In other words, plaintiffs do "not need to present an elaborate market analysis to show" that defendants have "enough power to produce an effect in the market" when defendants have in fact "already" caused such an effect. *Bhan*, 929 F.2d at 1413 n.10.

Here, plaintiffs established—or, at the very least, created disputed issues of fact concerning—"actual detrimental effects" in two markets: the labor market for top-tier swimmers' services (a necessary input if one is to hold professional swim competitions), and the market for international swim competitions itself.

The effect of GR 4 was to block all ISL events in 2018. As FINA's own expert acknowledged, ISL's inability to hold events in 2018 reduced output and deprived every swimmer who planned to race in one of ISL's planned events of an economic opportunity. 4-ER-690–91. The evidence

further shows that FINA's conduct deprived swimmers of at least $842,400 in prize money that ISL would have paid had it not been forced to cancel its Torino meet, reducing swimmer compensation in 2018 by at least 10% overall.  5-ER-1002; 2-ER-222; 5-ER-1056–1210; 6-ER-1212–1351.  The evidence also shows that GR 4 allowed FINA to artificially deflate its own compensation to swimmers in 2018.  As FINA's president wrote to his vice president in response to ISL's plans: "We need best swimmers at Fina events.  If he pay money to swimmers for his events then where is our sport???"  3-ER-648.  Subsequent events confirm that compensation deflation.  When ISL was able to enter the market in 2019 after the relaxation of GR 4, FINA had to respond competitively—by offering increased prize money at its existing events (from $4.65 million to $4.9 million), and by establishing an entirely new competition series modeled on ISL's team events, with additional prize money of $2.7 million.  4-ER-750; 5-ER-990–93; 4-ER-765.

This suppression of the compensation paid swimmers for their labor is itself sufficient to establish substantial anticompetitive effects.  *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 367–68 (3d Cir. 2004) (evidence of an agreement to raise prices between 5%–9% established

anticompetitive effects); Dep't of Justice & F.T.C., *Horizontal Merger Guidelines*, 4.1.2 Benchmark Prices and SSNIP Size (August 19, 2010) (the government "most often" uses 5% as the "small but significant" increase in price "commensurate with a significant loss of competition").

The evidence shows that FINA's enforcement of GR 4 not only caused anticompetitive effects in the market for swimmers' services, but also suppressed the output of international swim events. Indeed, enforcement of GR 4 blocked all competition to FINA swimming events in 2018. 3-ER-650; 3-ER-569; 3-ER-660; 4-ER-686–87; 5-ER-979. Those blocked events included not only ISL events planned for Las Vegas, London, and Torino, 4-ER-708; 4-ER-727–28; 4-ER-753, but also an event in Singapore planned by the World Swimming Association, which—like the ISL events—had to be scuttled after FINA threatened to enforce GR 4. 3-ER-491; 3-ER-495; 4-ER-937; pp. 7-10, *supra*. Those cancellations constitute direct evidence of reductions in output, depriving fans and sponsors of opportunities to watch or sponsor elite swimming events, a unique product. *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1155 (9th Cir. 2019) ("professional football games

have no substitutes" because "fans do not consider NFL games to be comparable to other sports or forms of entertainment").

In rejecting this substantial evidence of direct anticompetitive effects, the court committed two errors.

First, the court erroneously believed that GR 4 did not completely exclude ISL from the market in 2018 by depriving it of access to swimmers. As discussed above (*supra* at pp. 7–10), the evidence is directly to the contrary.

Second, the court erred in holding that plaintiffs could not rely on direct evidence of anticompetitive effects because "identifying the relevant market is critical to determining anticompetitive effects under the first step of the rule of reason." 1-ER-21–22. The court acknowledged multiple precedents stating precisely the opposite principle (i.e., that direct evidence of anticompetitive effects renders market definition unnecessary), but attempted to distinguish only one of those cases, *Indiana Federation*, and in so doing misstated that case's reasoning and holding. *Id.* at 22.

According to the court, "*Indiana Federation* relied on evidence the conspiring entities were the majority of suppliers in two local areas and

that the product market was localized." *Id.* at 23. But there was no "evidence" in that case that "the product market was localized"; instead, the Court relied on its own common-sense assessment "that markets for dental services tend to be relatively localized." *Ind. Fed'n*, 476 U.S. at 461. Similar common-sense assessments—for example, that elite professional swimmers are unlikely to take up football and that unpaid NCAA competitions are not a substitute for paid swimming opportunities, *cf.* 1-ER-20–21—are warranted here, where there is substantial evidence of anticompetitive effects in the form of suppressed wages and reduced output.

In any event, the Court in *Indiana Federation* made clear that its impressionistic review of the relevant market was unnecessary to its holding. The Court's primary rationale was that, in light of the direct evidence of anticompetitive effects and the horizontal nature of the restraint, *no* analysis of the market was necessary because, "as a matter of law, the absence of proof of market power does not justify a naked restriction on price or output." *Ind. Fed'n,* 476 U.S. at 460 (alteration omitted). By its own terms, *Indiana Federation* relied on "proof of actual detrimental effects"—in particular, the fact that "insurers in those areas

were, over a period of years, actually unable to obtain compliance with their requests for submission of x rays"—rather than "market definition and market power." *Id.* *Indiana Federation*'s holding that a "failure to engage in detailed market analysis is not fatal to its finding of a violation of the Rule of Reason," *id.* at 461, is thus directly at odds with the court's holding below that "identifying the relevant market is critical." 1-ER-21–22.

Ninth Circuit precedent likewise makes clear that evidence of market definition and market power are not required when there is direct evidence of anticompetitive effects. *Epic Games*, 67 F.4th at 974 n.6 ("[W]e have never held that a precise market definition is an absolute requirement."); *PLS.Com*, 32 F.4th at 834 ("When a plaintiff [establishes direct anticompetitive effects], no inquiry into market definition and market power is required." (internal quotation marks and alteration omitted)); *Rebel Oil Co.* v. *Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) ("If the plaintiff puts forth evidence of restricted output and supracompetitive prices, that is direct proof of the injury to competition which a competitor with market power may inflict, and thus, of the actual exercise of market power."); *Bhan*, 929 F.2d at 1413 ("If the plaintiff can

make a showing of anti-competitive effects, a formal market analysis becomes unnecessary."); *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1448 (9th Cir. 1988) ("Defining the market is not the aim of antitrust law; it merely aids the search for competitive injury."). The court had no grounds to depart from this well-established precedent.

## III. The court erred in holding that expert testimony was required to establish the relevant market.

Even if plaintiffs were required to present evidence defining the relevant market despite presenting direct evidence of anticompetitive effects, the court erred in holding that the market must be established through expert testimony. In addition to the direct evidence of anticompetitive effects, the testimony of market participants—swimmers and ISL—is sufficient to prove the contours of the labor market for top-tier swimmers, creating, at the very least, an issue of fact. A jury can find such a labor market based on the testimony of the swimmers and ISL, who do not view swimming in college events for no compensation, or participating in non-swimming sports, let alone entertainment events, as being interchangeable with being a professional swimmer. *See* pp. 15, *supra*.

The court mistakenly believed that the relevant market must be defined through expert testimony. 1-ER-20–21. Not so. In cases "in which no expert has testified the court should still examine the record to determine whether the evidence is sufficient to support the plaintiff's alleged market." Areeda & Hovenkamp, 531f; *accord United States v. Pabst Brewing Co.*, 384 U.S. 546, 549 (1966) ("[T]he failure of the Government to prove by an army of expert witnesses what constitutes a relevant 'economic' or 'geographic' market is not an adequate ground on which to dismiss a [Clayton Act Section] 7 case."). Direct evidence of anticompetitive effects and lay testimony of market participants suffice. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 893 (10th Cir. 1991) (lay testimony by plaintiff sufficient to establish market); *Gen. Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 806 (8th Cir. 1987) (market share proven via "observations made by persons familiar with the market").

The court also failed to appreciate that there are two separate markets at issue here—and that one of them, the labor market for top-tier, professional swimmers, clearly does not require expert testimony to define it. According to the court, without expert testimony as to the

definition of the relevant market, it is impossible to know the cross-elasticity of demand between the product at issue here, "top-tier international swimming competitions," and "its substitutes." 1-ER-20. But even if the expert testimony regarding cross-elasticity of demand was necessary to define the product market, it is not necessary for defining the relevant labor market for top-tier professional swimmers. The scope of that market is readily apparent: organizers of professional swimming competitions such as FINA, ISL, and WSA, have no need for non-swimmers; and professional swimmers cannot interchangeably sell their labor as swimmers to anyone other than organizers of professional swimming competitions.

Because it wrongly focused solely on the relevant product market, the court asked how, without expert testimony, it could know whether "top-tier international swimming competitions" are "interchangeable with NCAA Division I swimming competitions, top-tier international sports, sports more broadly, or entertainment more broadly?" *Id.* None of these alternatives are plausible substitutes for participants in the *labor* market for top-tier professional swimmers. NCAA events are not a professional alternative; it is undisputed that the NCAA does not

compensate swimmers.  And non-swimming sports and entertainment events are clearly not interchangeable for top-tier swimmers seeking to pursue their careers as professional swimmers.  Numerous courts have found relevant markets limited to a single sport.  *See, e.g.*, *Alston*, 141 S. Ct. at 2151 (Football Bowl Subdivision football and Division I basketball players); *Bd. of Regents*, 468 U.S. at 111 ("[I]ntercollegiate football telecasts generate an audience uniquely attractive to advertisers"); *Int'l Boxing Club v. United States*, 358 US 242, 249-51 (1959) (separate market for championship boxing); *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381, 1394 (9th Cir. 1984) (professional football franchises); *McNeil v. Nat'l Football League*, 790 F. Supp. 871, 893 (D. Minn. 1992) (professional football players); *U.S. Football League v. Nat'l Football League*, 644 F. Supp. 1040, 1057 (S.D.N.Y. 1986), *aff'd*, 842 F.2d 1335 (2d Cir. 1988) (professional football); *Robertson v. Nat'l Basketball Ass'n*, 389 F. Supp. 867, 892 (S.D.N.Y. 1975) (professional basketball players); *Phila. World Hockey Club, Inc. v. Phila. Hockey Club, Inc.*, 351 F. Supp. 462, 501–02 (E.D. Pa. 1972) (amateur professional hockey).

Expert testimony is not required to establish a separate labor market for top-tier professional swimmers. Such a market can easily be found by a jury based on the testimony of market participants. *Fox v. Good Samaritan Hosp.*, 2007 WL 2938175, at *9 (N.D. Cal. Oct. 9, 2007) (plaintiff doctor's testimony defining geographic market raises a "question of fact for the jury"); *Sidibe v. Sutter Health*, 2019 WL 2078788 at *24 (N.D. Cal. Apr. 12, 2019) ("[I]f non-expert evidence raises a dispute of material fact, then the court must deny Sutter's summary-judgment motion"); *Pabst Brewing*, 384 U.S. at 549 (reversing dismissal based on failure to define market where government supplied "documents, statistics, official records, depositions, and affidavits by witnesses" to establish relevant market); *Hartz Mountain Corp.*, 810 F.2d at 806 (jury could reasonably find relevant market and power based on testimony from owner and sales manager); *S&S Commc'ns v. Local Exch. Carriers Ass'n, Inc.*, 2006 WL 519651, at *15 (D. S.D. Mar. 1, 2006)("Market share can be shown by . . . observations made by persons familiar with the market"); *Fed. Trade Comm'n v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 345–46 (3d Cir. 2016) (testimony from insurers "properly define[d]" the relevant market). Here, that testimony comes from the swimmer

plaintiffs, who have made it clear that their labor market was limited to "international events that offer large pools of prize money and/or appearance fees," and their competitive alternatives were limited to FINA and ISL events. 2-ER-96–97. It also comes from the testimony of ISL's Konstantin Grigorishin, who explained that swimmers who "have competed in the Olympic Games, medaled in those games, or medaled in other top swimming competitions" constitute a distinct class of competition participants for whom "other athletes cannot be substitutes." 2-ER-85–86.

Based on this factual record from actual participants in the business, expert testimony is not required for the jury to determine that there is a relevant labor market limited to the employers of top-tier professional swimmers—just as there would be no need for expert testimony to establish that there is a relevant labor market limited to employers of professional police officers, in which neither organizers of neighborhood watches nor fire departments participate.

## IV. The court abused its discretion by precluding plaintiffs from presenting a merits expert on market definition.

In entering summary judgment in favor of FINA, the court found plaintiffs' failure to present expert testimony establishing a relevant

market dispositive, holding that the absence of such testimony prevented plaintiffs from proving anticompetitive effects. 1-ER-20. But, if that decision was correct, it was an abuse of discretion for the court to reject plaintiffs' request for a short extension of the time to produce an expert report on that subject.

Although district judges enjoy broad discretion in supervising the pre-trial phase of litigation, this Court has explained that district judges "should generally allow amendments of pre-trial orders provided three criteria are met: (1) no substantial injury will be occasioned to the opposing party, (2) refusal to allow the amendment might result in injustice to the movant, and (3) the inconvenience to the court is slight." *Amarel* v. *Connell*, 102 F.3d 1494, 1515 (9th Cir. 1996) (internal citation and quotation marks omitted). Here, all three of those criteria weighed heavily in favor of granting plaintiffs' extension request.

*First*, the extension would not have injured FINA, substantially or otherwise. Plaintiffs requested that deadlines be extended so that "both sides" could provide merits expert testimony. 1-ER-38; 2-ER-116–27. Both parties had agreed to amend the case schedule and, because FINA was seeking to submit an expert report itself, plaintiffs' proposed

deadline to disclose an expert report would not have extended discovery beyond what FINA already believed was acceptable. 2-ER-117 (requested expert discovery deadline of April 22, 2022). Plaintiffs requested less than a two-month extension and no trial date had been set. *Compare* 1-ER-51–80 (creating deadline of April 12, 2022) *with* 2-ER-116–27 (May 23, 2022). There was thus no basis to conclude that there would be *any* injury, let alone "substantial injury," to FINA from extending the deadline for expert reports. Tellingly, the court never suggested there would have been.

*Second,* the denial of the requested extension in fact resulted in injustice to plaintiffs, whose claims were dismissed for failure to produce an expert report on market definition and power. Although plaintiffs maintain that expert testimony is not required to prove their claims (pp. 40-45, *supra*), the court's contrary holding, if sustained on appeal, means their entire case has been dismissed because of the court's refusal to grant a brief extension of time. This Court has warned courts against excluding case-dispositive evidence for lack of timely production without first finding "the claimed noncompliance involved willfulness, fault, or bad faith" and considering "the availability of lesser sanctions." *R & R*

*Sails, Inc. v. Ins. Co. of Pa.*, 673 F.3d 1240, 1247 (9th Cir. 2012). No such findings were made here.

*Finally,* the record demonstrates that any "inconvenience to the court" was, at most, slight. It was undisputed that the schedule proposed by plaintiffs "wouldn't materially delay the case" and would still permit "a trial this year," and plaintiffs indicated that they were prepared to accept "whatever schedule your Honor deems appropriate . . . ." 1-ER-38. Indeed, the court stated that "I probably would have signed the stip if the parties had agreed to allow both sides" extensions. *Id.* at 44. Because the court was upset that the parties could not agree, it abused its discretion by failing to grant plaintiffs a brief extension of time to present a merits expert report that the court believed plaintiffs were legally required to present.

## CONCLUSION

The judgment of the court should be reversed, and the case remanded for trial.

Dated: June 14, 2023

Respectfully submitted,

s/ *Jeffrey L. Kessler*
Jeffrey L. Kessler
Johanna Rae Hudgens
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
Tel.: (212) 294-6700
Fax: (212) 294-4700
Email: jkessler@winston.com
Email: jhudgens@winston.com

Jeanifer E.  Parsigian
WINSTON & STRAWN LLP
101 California Street, 35th Floor
San Francisco, CA 94111
Tel.: (415) 591-1469
Fax: (415) 591-1400
Email: jparsigian@winston.com

Andrew Tauber
WINSTON & STRAWN LLP
1901 L Street, NW
Washington, D.C. 20036
Tel.: (202) 282-5288
Fax: (202) 282-5100
Email: atauber@winston.com

*Counsel for Plaintiffs-Appellants*
*Thomas A.  Shields, et al.*

s/ *William A. Isaacson*
William A. Isaacson
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
2001 K Street, N.W.
Washington, DC 20006

(202) 223-7300
wisaacson@paulweiss.com

Meredith Dearborn
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
535 Mission Street, 24th Floor
San Francisco, CA 94105
(650) 208-2788
mdearborn@paulweiss.com

Brette Tannenbaum
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
NEW YORK, NY 10019
(212) 373-3852
btannenbaum@paulweiss.com

*Counsel for Plaintiff-Appellant
International Swimming League,
Ltd.*

## STATEMENT OF RELATED CASES

*International Swimming League, Ltd. v. World Aquatics*, No. 23 15156, pending in the Ninth Circuit, is a related case to this matter. This case was a related case to this matter in the district court and has been appealed on a separate issue.

**FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS**

**9th Cir. Case Number(s):** No. 23-15092

I am the attorney or self-represented party.

**This brief contains 10,747 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

**[X]** complies with the length limit designated by court order dated April 18, 2023.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** *s/Jeffrey L. Kessler* _____ **Date** _June 14, 2023_____